IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2012

IN THE MATTER OF D.C., Jr., G.C., D.C., AND H.C.

Appeal from the Weakley County Juvenile Court
No. C2491    James H. Bradberry, Judge

No. W2012-00469-COA-R3-PT - Filed September 17, 2012

This appeal involves the termination of a father's parental rights.  The four children at issue
were removed from the father's home by the Tennessee Department of Children's Services
due to neglect and abuse.   After three years, the Department instituted termination
proceedings.  The juvenile court terminated the father's parental rights on grounds of
abandonment for failure to provide a suitable home, substantial noncompliance with the
permanency plan, and persistent conditions, but it declined to find abandonment by failure
to support.  The father appeals both the grounds for termination and the best interest finding.
We reverse the trial court's holding on abandonment by failure to support, affirm to the
remainder, and so affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed in
Part and Affirmed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P. J.,
W.S., and J. STEVEN STAFFORD, J., joined.

Beth F. Belew, Paris, Tennessee for Respondent/Appellant D.C., Sr.

Robert E. Cooper, Jr., Attorney General and Dianne Stamey Dycus, Deputy Attorney
General, Nashville, Tennessee for Petitioner/Appellee State of Tennessee Department of
Children's Services.

# OPINION

## FACTS AND PROCEEDINGS BELOW

These termination proceedings cap off over ten years of involvement by the Tennessee Department of Children's Services (DCS) with this family. The children at issue in this appeal, son, D.C., Jr. (born in 1999), son, G.C. (born in 2002), daughter, D.C. (born in 2003), and daughter, H.C. (born in 2004) (collectively "the children") were born to A.C. ("Mother") and D.C., Sr. ("Father"). Mother and Father were married, but later divorced. Father has remarried.

DCS first became involved with this family in the spring of 2000, when Father and Mother were still living together in the same home. Over the ensuing eight years, there were at least six referrals to DCS about the children, for physical neglect, environmental neglect, substantial risk of physical injury, lack of supervision, and sexual abuse. Over a period of several years, DCS provided family support services, including services on parenting skills, anger management, budgeting, homemaker skills, counseling on truancy issues, and therapeutic supervised visits. Father initially refused DCS services, then later permitted them but was largely uncooperative and not receptive. A local church came to the house to clean it. Despite this, the children's circumstances in the home did not improve.

Things came to a head in October 2008. At that time, DCS received another referral to the children's home for allegations of drug exposure and physical abuse. Upon arriving at the home, DCS workers found it in a "deplorable" condition. The floors were filthy with food lying around and roaches everywhere; the children were seen picking food up off the floor and eating it. The home was located on a busy highway but was unsecured, with the four children at issue in this appeal, then ages 9, 6, 5, and 4 years old, free to run out toward the highway. At the time DCS came to the home, some of the children could not even be located. The home had open wiring, no light switch covers, and broken floorboards. DCS workers who visited the home described the children as "extremely dirty," wearing clothing caked with old food and unmatched shoes that were too small and had holes. The children's hair was unwashed and uncombed, some had lice, and overall they had very poor hygiene and a foul odor about them. The children told DCS workers that they had to take baths and do dishes at the same time, in the same water. They told DCS that they tried to help their own living situation by mowing the grass themselves and washing their own clothes; without a clothes dryer, they just laid their wet clothes out on the grass to dry. One of the children told the DCS investigator that they helped Father plant "dirty flowers" under the house with a special light on them that "buzzed on and off." The children were made to crawl under the house to water and maintain Father's plants; Father's friends would then "come and take [the

-2-

plants] away." In light of these circumstances, the children were taken into protective custody. Father was incarcerated on drug charges.

On October 22, 2008, the Juvenile Court of Weakley County conducted a preliminary hearing, which both Mother and Father attended. A guardian ad litem was appointed to represent the children. Mother was appointed counsel and eventually Father was as well.[1] The order that resulted from the hearing permitted Father therapeutic visitation with the children. In February 2009, a subsequent order adjudicating the children dependent and neglected recited that DCS had either provided or offered the family the following services: parenting assessment and support, drug testing, case manager services, as well as assistance with transportation, arranging visitation, and obtaining counseling and drug and alcohol services.

In April 2009, Father was ordered to pay child support in the amount of $94.20 per month for each child ($471 per month) plus $5.00 per child per month in retroactive child support, for a total child support obligation of $496 per month. After the child support order was entered, Father was unemployed part of the time and was working part of the time; his child support payments were garnished from either his unemployment check or his paycheck when he was working.

In July 2010, DCS attempted to reunify the children with Mother by returning the children to her custody on a trial basis. This had disastrous results. While the children were under Mother's care, one of the daughters was sexually molested by an older brother, a child not at issue in this appeal.[2] Mother had knowledge of the abuse and failed to protect her daughter from it. The children were placed back into foster care, and a permanency plan was adopted.

In February 2011, the Juvenile Court entered an order holding for the second time that the children were dependent and neglected. Father stipulated to the finding of dependency and neglect. The Juvenile Court made a finding of severe abuse based on Mother's failure to protect her daughter from sexual abuse by her older brother.

---

[1] At this juncture, Father said that he wanted to hire his own counsel. Later, in January 2009, Father changed his mind and indicated he would accept appointed counsel. After that, Father changed counsel several times, for a variety of reasons, until ultimately his current attorney was appointed.

[2] It is not clear from the record whether this brother was Father's biological child. The brother admitted the sexual molestation; he was charged with aggravated sexual battery and placed in juvenile detention.

Around this time, Father decided to move to Texas, supposedly to find better work. Before he moved, DCS told Father that it could not provide him services in another state and pointed out that it would be difficult for him to visit his children if he were living in Texas. This did not deter Father. He moved to Texas in February 2011.

In Texas, Father eventually moved into a two-bedroom trailer with his new wife and her daughter. After he moved, DCS contacted Texas's children's services to inform them of Father's needs and attempted to obtain assistance for Father in Texas. However, Father did not follow through or contact anyone for assistance in Texas. Meanwhile, Father failed to obtain the updated parenting assessment and complete the counseling required under the Tennessee permanency plan. Once Father moved to Texas, he stopped paying child support. He did not come to Tennessee to visit the children, and the children did not wish to go to Texas to visit him.

In March 2011, another permanency plan was adopted. This plan required Father to continue paying child support, attend counseling, and follow the counselor's recommendations. The expected achievement date for this plan was September 2011. None of these tasks were completed.

In May 2011, DCS filed a petition in the Juvenile Court to terminate the parental rights of both Mother and Father. The grounds asserted in the petition included: (1) abandonment due to failure to support; (2) abandonment due to failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; and (4) persistent conditions.[3]

The Juvenile Court held a hearing on the DCS termination petition on September 8, 2011. Neither Father nor Mother attended the hearing.[4] On September 20, 2011, the Juvenile Court entered an order terminating the parental rights of both Mother and Father.

However, on September 19, 2011, the day before entry of the order terminating his parental rights, Father sent a *pro se* letter to the Juvenile Court stating that he did not receive notice of the September 8, 2011 hearing. Father asked the Juvenile Court to set aside its decision. On November 8, 2011, the Juvenile Court entered an order setting aside the termination of parental rights as to Father only. A second hearing was scheduled for January 19, 2012.

---

[3]Severe abuse was also included as a ground for termination, but only as against Mother, based on her failure to protect her daughter from sexual abuse. The termination of Mother's parental rights is not an issue on appeal.

[4]The record on appeal does not contain a transcript of this hearing.

The hearing commenced on January 19, 2012 as scheduled. At the outset of the hearing, DCS informed the Juvenile Court that Daughter D.C., then eight years old, had asked to speak to the Court. She was allowed to speak to the Court in a cleared courtroom, with the lawyers and a court reporter present. Asked why she wanted to talk to the Judge, Daughter D.C. replied, "I don't want to go live with my daddy." She described sexual abuse by Father and physical abuse and neglect of herself and her siblings. After the Juvenile Court Judge thanked Daughter D.C. for having the courage to talk to him, she said, "I hope I get a new mom and dad."

Father was called as a witness by DCS and testified at length. Father acknowledged a long history with DCS but blamed the problems on Mother. After it was noted that some DCS referrals occurred after Mother moved out of the home, Father said, "Yeah, well, when you p--- a woman off, you just don't know what they can do behind your back." Asked about the condition of his home at the time the children were removed, Father claimed that it was "[l]ivable for anyone" but acknowledged: "I mean, we've had roaches. We've had rats. Nothing other than all poverty people have." He conceded that the children were often truant for various reasons, including the fact that Father admittedly "was high and didn't want to take them to school, didn't want to get up." He added: "I mean, I was a pothead at the time." Father denied growing marijuana but admitted selling it and acknowledged that he had been unemployed for over a year when the children were taken into protective custody. He said that a church helped him pay his bills on occasion and also supplied the children with clothing and cleaned up his house.

Father testified that his responsibilities under the permanency plan were to "receive a mental health intake, obtain employment and keep it, and a home." He also knew that he was required to follow all of the recommendations from the mental health intake. Father claimed that he underwent a mental health intake and was told that he needed to undergo counseling. He went to two or three counseling sessions but stopped going because they were "irrelevant" and "ridiculous." Father denied any sexual abuse of his daughter.

Father testified that he underwent a drug and alcohol assessment but said that he never gave DCS a copy of it. He acknowledged urine tests that were positive for marijuana "a few times."[5] Father admitted that DCS provided therapeutic visitation and weekly parenting assistance from Lori Powers at Wolfe Counseling. He recalled having one parenting assessment, but said that he did not have the required updated assessment. He did recall having psychological examinations in both Tennessee and Texas.

---

[5]Father noted that, on one occasion, a hair follicle test was negative.

Father admitted that he had paid no child support since he moved to Texas. He said he could pay bills but did not have enough money for child support. In Texas, he said, he is receiving food stamps. Father testified that he is self-employed in Texas and had purchased a two-bedroom trailer in Texas for himself, his wife and his stepdaughter. Father admitted that his current living situation in the Texas trailer would not be suitable for him to take custody of his four children. Asked how he could come to court and request custody of his four children under those circumstances, Father protested that, although DCS had told him that he needed an appropriate home, "they never said get a home for your children." If granted custody of his children, Father said, he would need three or four additional months in order to secure housing in Texas that was suitable for all of them.

The Juvenile Court heard testimony from Lori Powers, the family support counselor at Wolfe Counseling who provided services for Father and the family over a period of four years. Powers testified that the support services provided to the family were comprised of attempting to teach Father parenting skills, anger management, budgeting, homemaker skills, and anything else the family needed. The main focus, she said, was on parenting. Powers conducted 26 therapeutic supervised visits with Father and his children, to help Father engage and bond with the children in a safe environment where Powers could encourage parenting skills such as age appropriate discipline. Powers noted that, during her support sessions with the family, "random" people the children did not know would come to Father's house, act nervous, and leave quickly. She suspected that these visits were drug related.

When therapeutic visits between Father and the children were scheduled, Powers testified, the children were told that they could call the DCS case worker in advance to tell her that they did not want to attend the visit. Powers said that the children did so on several occasions. Before the children's supervised therapeutic visits with Father, Powers said, she gave the children a secret signal to use if they felt threatened, afraid, or needed a break during the visit. Powers testified that the children used the secret signal multiple times and recounted a specific instance in which Daughter D.C. used the secret signal because she was afraid of Father. When asked why Daughter D.C. was scared of Father, Powers stated that Daughter D.C. had an extensive conversation with her explaining that she "was having recollections of being in [Father's home] and feeling fearful about someone coming in in the middle of the night and touching her inappropriately, and she was afraid." After consulting her notes, Powers testified that Daughter D.C. had specifically told her that Father "had put his fingers in her vagina and that she felt that that was something that bad men do . . . ."

Powers also testified about her observations on the condition of Father's house. When she first began coming to the home, Powers said, it was in "very poor condition." From time to time, she said, Father received assistance from the members of his church, who would come in and vacuum and clean. Soon, however, the house would get dirty again: "I'm not talking

your not dusting, not vacuuming. I'm talking dirty, nasty." Powers said she always had safety concerns about the house. Father would ask others for help, Powers said, but did not undertake to solve problems with the home himself and did not take responsibility for the state of the home. With Father, Powers said, "there was usually an excuse." Powers said that, after three and a half years of working with Father and the children, she never became comfortable with returning the children to Father's care.

The Juvenile Court also heard testimony from the DCS case manager for the family, Vanessa Harrison. Harrison said that she had worked with the family for three years. She communicated with Father "probably once or twice" a month and conducted multiple children and family team meetings in which Father's responsibilities were discussed in detail.[6] For the last three years, Harrison testified, she had been telling Father the same things over and over, in order to get his act together.

Harrison testified that Father never told her that he completed the alcohol and drug assessment required under the permanency plan. She said that Father did a parenting assessment, which recommended a physiological exam and individual therapy to address his mental health issues. Father quit the recommended counseling after two sessions, and Harrison said that the counselor classified his participation in therapy as superficial and indicated that no progress was made. She said that Father told her that he could not afford to pay for counseling, but when she found a counseling service that he could attend at no charge, he did not attend.

Harrison stated that DCS had provided numerous services to Father, such as paying his rent and utilities a couple of times, providing gas cards, paying for his parenting assessment, and providing him with therapeutic supervised visitation and family support services for three years. All told, Harrison said, DCS spent approximately $18,000 assisting this family. DCS did not assist Father with actually cleaning his home because Father never asked for that assistance and told Harrison that he was receiving assistance from his church. Despite Father having received that assistance, she said, at no time did she believe that the house reached the point where it was appropriate for the children to live there.

Before Father moved to Texas, Harrison said, DCS told him that DCS would not be able to provide services to him outside the State of Tennessee. He moved anyway in February 2011. After Father moved, Harrison called Texas's children's services to tell them Father was

---

[6]Harrison stated that Father did not attend all of these meetings, but if he was not present his lawyer would attend. In addition, if Father did not attend a meeting, Harrison sent Father a summary of what took place at the meeting.

coming and what needs he had. To Harrison's knowledge, Father never followed up with them.

Harrison testified that DCS had never refused help to Father when he asked for it. She felt that she and DCS had made every effort to assist him in regaining custody of his children. Despite these efforts, Harrison said, Father made little progress because he refused to take responsibility and everything was always someone else's fault.

Harrison described how the children were faring in their current foster homes. She reported that the children were interacting socially, making good grades, and were involved in activities such as basketball, football, and cheerleading. They were quiet and reserved when they were first removed, she said, but by the time of trial, they were much less so. Harrison stated that all of the children have been in counseling, and will require more. Several were taking more than one psychotropic medication, stemming in part from their emotional issues.

At the conclusion of the hearing, the Juvenile Court took the case under advisement. On March 21, 2012, the trial court entered an order terminating Father's parental rights, based on abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistent conditions. It declined to find abandonment for failure to support, finding that Father had paid minimal support during the four months preceding the filing of the petition to terminate. The trial court also found by clear and convincing evidence that termination of Father's parental rights was in the best interest of the children. Father now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Father raises four issues on appeal. They are as follows:

> Whether the record contains clear and convincing evidence to support the trial court's determination that [Father] "abandoned" the children as defined in Tenn. Code Ann. Section 36-1-113(g)(1) and Tenn. Code Ann. Section 36-1-102(1)(A)(iv).

> Whether the record contains clear and convincing evidence to support the trial court's determination that [Father] was substantially noncompliant as defined in Tenn. Code Ann. Section 36-1-113(g)(2) and Tenn. Code Ann. Section 37-2-403(a)(2).

> Whether the record contains clear and convincing evidence to support the trial court's determination that [Father] failed to alleviate the conditions which led

-8-

to the removal of the children or which would prevent their reunification with him as defined in Tenn. Code Ann. Section 36-1-113(g)(3).

Whether the record contains clear and convincing evidence to support the trial court's determination that it was in the children's best interest to terminate the parental rights of [Father].

The State also asks us to review whether the Juvenile Court erred in holding that Father abandoned the children by failure to provide a suitable home, pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-1-2(1)(A)(ii).

Thus, for reasons that are not clear, both parties raise on appeal a ground for termination on which the Juvenile Court ruled in its favor. Father raises abandonment by failure to support even though the Juvenile Court did not find clear and convincing evidence to support this ground, and DCS raises abandonment by failure to provide a suitable home, even though Father does not raise it on appeal and the Juvenile Court ruled in the State's favor on that ground.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2010). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *20 (Tenn. Ct. App. Oct. 7, 2011).

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citing *M.L.B v. S.L.J.*, 519 U.S. 102, 119 (1996)). The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.*, 140 S.W.3d at 653. Evidence satisfying the clear and convincing evidence standard establishes that the facts asserted are "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan. 10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at

*9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug. 13, 2003)). The evidence should produce a firm belief or conviction in the fact finder's mind as to the truth of the facts sought to be established. *In re A.T.P.*, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *14 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)). The appellate court applies the clear and convincing evidence standard as follows:

> In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to the credibility of the witnesses. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed de novo on the record, affording them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993); *In re Tiffany B.*, 228 S.W.3d at 156.

*In re Askia K. B.*, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *21-22.

ANALYSIS

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65; 120 S. Ct. 2054, 2059-60 (2000); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993); ***Ray***, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons, it is not absolute. ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006); ***In re J.W.P.***, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. ***In re Audrey S.***, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002); ***In re S.M.***, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004); ***In re M.J.B.***, 140 S.W.3d at 652-53).

## Grounds for Termination

In the Statement of the Issues in Father's appellate brief, he appeals each ground on which the Juvenile Court based its decision, except abandonment by failure to provide a suitable home. In the Argument portion of Father's brief, he makes the overarching argument that DCS failed to make reasonable efforts to assist him in regaining custody of his children. As the reasonable efforts argument pertains to all of the grounds at issue in this case,[7] we address that first, and then each ground on which the Juvenile Court relied. Out of an abundance of caution, we then address the issue of abandonment by failure to support, raised by Father

---

[7]We note that DCS is not required to exert reasonable efforts in circumstances involving severe abuse, such as sexual abuse or sexual exploitation. Tenn. Code Ann. § 37-1-166(g)(4). However, in this case, no grounds for termination involving sexual abuse were ever asserted against Father. Indeed, there is no indication in this record that allegations of sexual abuse by Father were ever even investigated. This is despite the fact that Daughter D.C. expressly accused Father of sexually abusing her, long before she told the Juvenile Court Judge in court about the abuse. Specifically, Lori Powers testified that, in the course of her facilitation of "therapeutic visits" between Father and the children, Daughter D.C. graphically described to Powers sexual abuse at Father's hands. Powers did not specify when this disclosure took place, but it had to have occurred before Father moved to Texas in February 2011. The children's counselor also testified that Daughter D.C. had been forthcoming to him about the sexual abuse in her counseling sessions. In his testimony, Father first denied any sexual abuse and then launched into a convoluted and dubious explanation involving putting ointment on the child. No one at trial indicated, or even inquired, about any investigation, or any criminal charges against Father, arising out of the child's allegations. Even the Juvenile Court Judge made no such inquiry. DCS case worker Vanessa Harrison testified that, after Father moved to Texas, she contacted the Texas children's services about providing services to Father, but there is no indication that her conversations with the Texas authorities included notifying them of the allegations of sexual abuse against Father, even though it is undisputed that Father lives in a two-bedroom trailer in Texas with his new wife's young daughter.

even though the Juvenile Court ruled in his favor on that ground, and finally the ground of abandonment by failure to provide a suitable home, raised by DCS even though Father did not raise it on appeal and the Juvenile Court ruled in the State's favor on that ground.

### *Reasonable Efforts*

Father contends that DCS, overall, failed to utilize reasonable efforts to assist him in reunifying him with his four children. He relies on the testimony of DCS case worker Harrison. Specifically, Father points out that Harrison admitted that DCS did not provide assistance to Father in cleaning and fixing his home and that Harrison testified that she did not know whether Father ever obtained the alcohol and drug ("A & D") assessment required under the permanency plan. On this basis, Father argues, DCS failed to show by clear and convincing evidence that it utilized reasonable efforts to assist Father.

Under the Tennessee statutes governing the termination of parental rights, in most instances in which a child has been removed from the parent's home, DCS is required to make reasonable efforts to reunify the parent with the child. *In re Tiffany B.,* 228 S.W.3d 148, 158 (Tenn. Ct. App. 2007)(citing Tenn. Code Ann. § 37-1-166(2010)); *see also In re Chase A.C.,* No. E2009-01952-COA-R3-PT, 2010 WL 325711, at *18; 2010 Tenn. App. LEXIS 523, at *54 (Tenn. Ct. App. Aug. 18, 2010). Reasonable efforts must be shown as an element of the State's proof on grounds for termination. Tenn. Code Ann. § 36-1-113(m)(2010). The term "reasonable efforts" is defined by statute:

> As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to a child, as described in this subdivision (g)(1), and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

Tenn. Code Ann. § 37-1-166(g)(1)(2010). The reasonableness of DCS's efforts depends upon the circumstances of a particular case. *In re Tiffany B.,* 228 S.W.3d at 158. This Court has recognized that the reunification of a family is "a two-way street." *In re Tiffany B.*, 228 S.W.3d at 159. Parents are responsible for addressing the conditions that led to the removal of the child from the home, and they must make reasonable efforts to rehabilitate themselves once services have been made available to them. *Id.; In re Chase A.C.,* 2010 WL 3257711, at *18. Moreover, effective May 10, 2010, Tennessee Code Annotated § 36-1-102(1)(A)(ii) was amended to include a provision stating:

The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

*In re Chase A.C.*, 2010 WL 3257711, at \*18 n.28.

In the instant case, the Juvenile Court found specifically that DCS had utilized reasonable efforts to assist Father in remedying the conditions which led to the children's removal and the conditions which prevent the children from currently returning to Father's custody, reciting extensively from the testimony of Lori Powers with Wolfe Counseling and DCS case worker Vanessa Harrison, detailing the many services that were either provided or offered to Father. The Juvenile Court also found that Father declined to take advantage of the services that were provided and offered to him, failed to make reasonable efforts to provide a home that was suitable for his children, and demonstrated such a lack of concern for the children that it was unlikely that he would be able to provide a safe home for them at an early date. In support of this finding, the Juvenile Court relied on Father's own testimony, as well as the testimony of Powers and Harrison. The Juvenile Court also noted that Father made a deliberate choice to move to Texas, with knowledge that DCS was not able to provide services to him outside of Tennessee.

The findings of the Juvenile Court are fully supported by the evidence in the record. Harrison detailed over $18,000 worth of services that were provided to the family, including hours and hours of therapeutic visits by Powers with his children intended to enable Father to have a healthy parent-child relationship with his four children. Powers testified that Father was so unreceptive to her assistance that she resorted to trying to teach the four very young children how to take care of themselves. Harrison located needed counseling for Father that was free of charge; he participated only a couple of times, dismissing it as "ridiculous." On appeal, Father points to Harrison's testimony about the one area in which DCS did not assist Father, namely, cleaning and fixing his home to make it suitable for his children. However, Harrison testified that Father specifically told her that he was receiving assistance from his church, and Father's testimony is consistent with this. Moreover, even after church members apparently swooped into Father's home to clean up his filth, the proof was that the safety hazards in the home were never fixed, and not long after the church members left, the house returned to its former state of squalor. Not even in Father's testimony is there any description of any substantial efforts that Father himself made to make his house habitable for his four small children.

In this case, the record shows that DCS provided substantial services to Father geared toward remedying the conditions that led to the children's removal from his custody. Unfortunately, its considerable efforts amounted to casting the proverbial "pearls before swine." The transcript of Father's testimony in the record consists of page after page of Father assigning blame for his circumstances to others and deflecting all responsibility. The Juvenile Court's finding that DCS made reasonable efforts is affirmed.

### *Substantial Noncompliance with the Permanency Plan*

Father argues that, contrary to the finding of the Juvenile Court, he was substantially compliant with the requirements of the permanency plan. He argues:

> Vanessa Harrison testified that [Father] maintained contact with her, even after he moved to Texas. [Father] called her regularly and when she called him, if she left a message he always called her back. Ms. Harrison testified that [Father] had made significant improvements on the home in Tennessee, but that she did not know if [Father] had an appropriate home in Texas, never checked it out or had anyone else do so. And Ms. Harrison further testified that [Father] did participate in several of the services offered, and that he told her he could no longer afford counseling.

Although Father's counsel on appeal makes a valiant effort to marshal the evidence in Father's favor on this issue, as discussed below, the record fully supports the Juvenile Court's finding that the tasks required of Father in the permanency plan were reasonably related to remedying the conditions that led to the removal of the children and that Father did not substantially comply with his responsibilities under the plan.

Tennessee requires the development of a plan of care for every foster child, setting forth the responsibilities of both the parent and the agency that are reasonably related to the plan's goals. Tenn. Code Ann. § 37-2-403(a)(2)(A) (2010). Substantial noncompliance by the parent with the statement in the permanency plan of the parent's responsibilities is a ground for termination of the parental rights. Tenn. Code Ann. § 36-1-113(g)(2) (2010). As an initial matter, the trial court must find "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547). To assess a parent's substantial noncompliance, a court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

-14-

On appeal, Father does not argue that the responsibilities assigned to him under the permanency plan were unreasonable or that he was unaware of his responsibilities under the plan. In his testimony at trial, Father acknowledged several responsibilities assigned to him under the permanency plan: (1) undergo an alcohol and drug assessment and pass random drug screens to address his drug use; 2) participate in mental health intake and follow any recommendations; 3) obtain and keep stable employment; 4) obtain and keep a stable and appropriate home.

Father testified that he underwent an alcohol and drug assessment as a probation requirement; however, he did not provide DCS a copy of this assessment. He said that there was no recommended treatment from the A & D counselor because he told the counselor he was not addicted to drugs. This was despite the fact that, in his own testimony, he described himself as a "pothead" with "a lot of drug issues" who was frequently so high that he could not bring the children to school, and said that the day the children were removed from his custody, "I was so high, I couldn't tell you what my name was." Father points to one clean hair follicle drug test, but the record also references at least two urine tests that were positive for marijuana, and another occasion on which Father admittedly refused to take the drug test required of him. Clearly, Father did not take seriously the drug and alcohol component of his responsibilities under the permanency plan and did not substantially comply with it.

Father claims to have complied with the mental health component of his responsibilities under the permanency plan because he participated in a mental health intake and attended two or three counseling sessions. The evidence in the record showed that Father's limited participation in counseling was described as "superficial" by his counselor, and Father himself testified that he found the counseling "ridiculous" and "irrelevant" and ceased attending even though DCS found counseling for him that was free of charge. Thus, Father's very significant mental issues went completely unaddressed, as he remained convinced he had no need for mental health services. Clearly, there was not substantial compliance with these responsibilities under the permanency plan.

While in Tennessee, after Father was released from incarceration for selling illegal drugs, he at times was unemployed and drawing unemployment compensation, and at other times was doing work such as hauling junk metal. His child support was garnished either from his unemployment compensation or from his paycheck. Now in Texas, Father says that he is "self-employed" but making so little that he is receiving food stamps. The money he earns goes to support himself, his wife and his stepdaughter, but he chooses not to pay any child support for his biological children. The record supports the Juvenile Court's finding of substantial noncompliance with this prong of the permanency plan.

-15-

Finally, as noted above, Father's squalid living conditions in Tennessee temporarily improved through the efforts of members of his church. However, the evidence in the record shows that the condition of the home slid back into its previous wretched state not long after the church members left. Moreover, the DCS case worker testified that the condition of Father's Tennessee home never reached the point of being a safe home for the children. Finally, Father admits that his home in Texas, a two-bedroom trailer, is unsuitable to house himself, his new wife, his stepdaughter, and his four children.

Considering Father's responsibilities under the permanency plans and the evidence in the record, we find clear and convincing evidence to support the Juvenile Court's holding that there was substantial noncompliance with the permanency plan.

### *Persistence of Conditions*

The Juvenile Court also found that DCS had established by clear and convincing evidence the ground for termination commonly referred to as "persistent conditions." The statute setting forth this ground for termination states:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> > (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> > > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> > > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> > > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A-C)(2010). Father argues that the children were removed from his home based on environmental neglect and drug exposure and asserts that those issues were resolved by November 2010, as Father by that time "had been compliant with services, had been exercising visitation with his children, had resolved his legal charges and made substantial improvements to his home." He also argues that DCS failed to prove that it exercised reasonable care and diligence to provide services reasonably necessary to meet Father's needs to assist him to remedy the alleged persistent conditions.

In evaluating the evidence in the record on this ground, we are mindful of the purpose behind its enactment:

> These grounds must be interpreted and applied in accordance with the express legislative intent of our statutory system of child removal, foster care, and adoption. One of the stated purposes of these statutes is "to protect [children] from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date." Tenn. Code Ann. § 37-2-401(a). Our courts have recognized the significance of permanency as the goal of decisions involving future placement of children and termination of parental rights. *See, e.g., State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

*In re L.F.B.*, No. M2005-00697-COA-R3-PT, 2005 WL 2978964, at *8 (Tenn. Ct. App. Nov. 7, 2005). *See also In re Audrey S.,* 182 S.W.3d at 872-73.

The children at issue in this appeal were removed from Father's custody in 2008. The record shows that DCS had been involved with this family for many years before the children were taken into protective custody. As noted above, we have rejected Father's argument that DCS did not utilize reasonable efforts to assist him. Despite DCS's efforts and provision of services and despite Father having been given so much time to address and remedy the conditions that led to the removal of the children, those conditions remain largely unaddressed. Told to obtain an alcohol and drug assessment and follow the counselor's recommendation, Father, an admitted "pothead," told the counselor he did not have a drug problem and so did not undergo treatment. The mental health issues that led to Father keeping the children in a filthy home and neglecting and abusing them remain unaddressed. Father earns money in Texas, obtains food stamps there, and supports his wife and stepdaughter in Texas, but he says that he still does not make enough money to pay child support for his biological children. Father concedes that he still does not have housing suitable for his children. Asked why, Father claims that he will have suitable housing if only the court will just give him a few more months. We disagree. It has been long enough.

We find that the evidence in the record supports the Juvenile Court's holding that the conditions which led to the children's removal, or that in all reasonable probability would subject these children to further abuse and neglect, still persist and prevent their safe return. Thus, we find that the Juvenile Court did not err in holding that the ground of persistent conditions was established by clear and convincing evidence.

### *Abandonment by Failure to Support*

Under Tennessee statutes, the parental rights of a biological parent may be terminated if the parent abandons his children by willfully failing to pay support. Tenn. Code Ann. § 36-1-113(g)(1). Such abandonment can take several forms. Tenn. Code Ann. § 36-1-102(1)(A)(i-v).[8] Pertinent to this case, abandonment by failure to support is defined as: "For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent[] . . . , that the parent[] . . . ha[s] willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i).

The Juvenile Court below found that the ground of abandonment by failure to support had not been established by clear and convincing evidence "because during the four months preceding the filing of the Petition to Terminate Parental Rights he did pay minimal support for the minor children." The Juvenile Court's order states that:

> [Father] paid $452 dollars in child support in the four months preceding the filing of the Petition for the benefit of four children. He conceded that the amount he had paid didn't even come close to supporting his minor children. However, he did pay a minimal amount. He moved to Texas and has not paid a penny in support since moving in February of 2011.

The DCS petition to terminate Father's parental rights was filed on May 26, 2011. Therefore, the statutory four-month period preceding the filing of the of the petition was from January 26, 2011 to May 26, 2011.

It is undisputed in the record that, prior to Father's move to Texas, child support was being garnished, first from his unemployment compensation and then from his paycheck. The payments were not in the amount of child support that Father owed for his four children, but

---

[8]Father's appellate brief mistakenly cites Section 36-1-102(1)(A)(iv) which applies only to an incarcerated parent. Moreover, Father's brief argues that the trial court ruled against Father on this ground, when in fact the Juvenile Court held that abandonment by failure to support had not been established by clear and convincing evidence.

regular support in a minimal amount was paid in this fashion. The appellate record includes a listing of the child support payments garnished from Father's pay. Father's last child support payments during the statutory four-month period preceding the filing of the petition to terminate, paid via garnishment, were in the amounts of $1.88 (02/01/2011), $22.89 (02/08/2011), $10.19 (02/15/2011), and $6.79 (02/22/2011), for a total of $41.75 during the four-month period. Thus, the evidence in the record preponderates against the Juvenile Court's finding that Father paid $452 during the statutory four-month period; instead, the undisputed evidence shows that he paid a total of $41.75.

Our legislature has stated that abandonment by failure to pay support includes "the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" under the statute "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). On appeal, DCS argues that the amount of support paid by Father during the statutory four-month period was, at best, token support, and he should be deemed to have abandoned the children by failure to support.

We agree. We recognize that Father was not making a great deal of money, either in Tennessee or after he moved to Texas. However, paying $41.75 for four children, even given Father's limited means, can only be seen as token support. In addition, it is undisputed, based on Father's own testimony, that once he moved to Texas, he simply decided to stop paying child support for his four children. He was working and earning money, but he testified that his money was spent to purchase a trailer for himself, his wife and his stepdaughter, and to support them instead of supporting his biological children.

Based on the undisputed evidence in the record, we must conclude that Father abandoned his children by failure to pay support. Therefore, we must reverse the Juvenile Court's holding on this ground for termination of Father's parental rights.

### *Abandonment by Failure to Provide a Suitable Home*

The Juvenile Court found by clear and convincing evidence that Father abandoned his children by failure to provide a suitable home. Father does not appeal the Juvenile Court's holding on this ground. For reasons that are unclear, DCS lists this as an issue presented for review. Regardless, we will briefly address it.

Abandonment based on a parent's failure to provide a suitable home is statutorily defined as follows:

-19-

The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . where . . . the department . . . . made reasonable efforts to prevent removal of the child or . . . the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent(s) . . . to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

Tenn. Code Ann. § 36-1-102(A)(1)(ii). In this case, the Juvenile Court held that DCS made reasonable efforts to prevent the removal of the children from Father's home and that DCS also made reasonable efforts in the four-month period following the removal of the children from Father's home. The Juvenile Court held, however, that Father did not make reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children to such a degree that it appeared unlikely that Father would be able to provide a suitable home at an early date.

As discussed at length above, there is abundant evidence in the record to support this holding by the Juvenile Court. Overall, DCS made more than reasonable efforts to assist Father on numerous issues, including rent, utility payments, and gas cards. On the issue of the state of Father's home, Harrison testified that Father did not request help and told her that he was already receiving help from his church. Powers testified that her in-home services, paid for by DCS, included instruction on homemaking skills. Even after church members worked to clean Father's home for him, Powers testified, the home quickly reverted to being "dirty [and] nasty." Harrison testified that Father's Tennessee house never got to the point of being a suitable home for the children.

Moreover, Father conceded that his Texas home was a two-bedroom trailer that already housed Father, his new wife, and her daughter and was admittedly not big enough for two adults and five children. Father admitted that he never intended for the trailer to house his four children, but instead made the rather questionable promise that, if he were awarded

custody, he would acquire suitable housing within a few months. All of this constitutes clear and convincing evidence that Father abandoned his children by failure to provide a suitable home. Therefore, we affirm the Juvenile Court's holding on this ground for termination of Father's parental rights.

## Best Interest

Once a single ground for termination is established by clear and convincing evidence, the Court must then consider whether termination of the parental rights of the biological parent is in the children's best interest. In evaluating best interest, the Court considers numerous factors including, but not limited to, those set forth in Tennessee Code Annotated § 36-1-113(i).[9] As referenced, this list of factors is not exhaustive, and the statute does not require

---

[9]Section 36-1-113(i) states as follows:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(continued...)

-21-

the trial court to make a finding as to each enumerated factor before concluding that terminating the parent's parental rights is in the best interest of the child. ***In re M.A.R.***, 183 S.W.3d at 667. We will address the statutory factors applicable to this case and any other matters that are relevant to whether termination of Father's parental rights is in the best interest of the children at issue in this appeal.

As referenced above, Father has not made an adjustment of circumstance, conduct, or condition so as to make it safe for these children to be in his home. Tenn. Code Ann. § 36-1-113(i)(1). Father was not receptive to assistance on his parenting skills, was less-than-forthcoming with the treatment specialist who performed his alcohol and drug assessment, and pooh-poohed mental health counseling as "ridiculous." He never had appropriate housing for his four children and has utterly given up paying child support for them. Overall, Father failed to make a lasting adjustment to his circumstances despite reasonable efforts by DCS. Based on this record, the chances that he will do so in the future hover somewhere between "slim" and "none." Tenn. Code Ann. § 36-1-113(i)(2).

The record also shows that Father does not have a meaningful relationship with his children. The children have not lived in his home for roughly four years. When Father had supervised therapeutic visitation with the children, they regularly either used a "secret signal" to indicate discomfort or fear during the visit, or chose to skip the visit altogether. Since Father moved to Texas in February 2011, the children have never chosen to visit him. ***See*** Tenn. Code Ann. § 36-1-113(i)(3). The compelling statements of young Daughter D.C. to the Juvenile Court Judge showed explicitly that at least she wanted nothing more to do with Father, given the abuse suffered by her and her siblings at Father's hands. Based on the record in this case, we can only conclude that there is no meaningful relationship between Father and the children. Tenn. Code Ann. § 36-1-113(i)(4).

The record also suggests that a change in caretakers would have a highly detrimental effect on the mental and emotional state of all of the children. All have been doing well since they were taken into protective custody. All are undergoing extensive counseling and are taking

---

[9](...continued)

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2011).

significant medication to deal with the aftermath of their upbringing. Tenn. Code Ann. § 36-1-113(i)(5).

Looking at the record as a whole, we must hold that clear and convincing evidence overwhelmingly supports the Juvenile Court's conclusion that termination of Father's parental rights is in the best interest of these children. *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Having found both grounds for termination and that termination is in the best interest of the children, we affirm the Juvenile Court's termination of Father's parental rights.

## CONCLUSION

The decision of the trial court is reversed in part and affirmed in part. Costs on appeal are assessed against Appellant D.C., Sr., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE